UNITED STATES DISTRICT COURT
FOR THE  SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

STEPHEN UNTERBERG;
SUSAN ECKMAN; RYAN SHUMAN;
DANICA BERNARD; STEVEN TABAK,
on behalf of themselves and all others
similarly situated.

Civil Action No.

Plaintiffs,

-against-                                                    **JURY TRIAL DEMANDED**

**JIMMY CARTER,**

                    -and-

**SIMON & SCHUSTER, Inc.,**

                    Defendants.

------------------------------------------------------------------ X

## CLASS ACTION COMPLAINT

Plaintiffs file this class action against the Defendants on their own behalf and as class

representatives for all others similarly situated.

### INTRODUCTION

1.      This is an action seeking damages for these Plaintiffs and all others who

purchased the book, *Palestine: Peace Not Apartheid,* written by Defendant JIMMY CARTER,

published by Defendant SIMON & SCHUSTER, Inc., and promoted by them both as a work of

non-fiction, deserving of special weight and consideration because of Carter's standing as a

former President, which purportedly provides an accurate factual record of historical events and key agreements related to negotiations between Israel and Palestinian Arabs.[1]

2.      Plaintiffs and others who bought the book did so in reliance on Defendants' representations that the events and agreements which are the subject of the book were described accurately, fully and fairly as they actually occurred.  In truth, however, the book is filled with demonstrable falsehoods, omissions, and knowing misrepresentations intended to promote Carter's agenda of anti-Israel propaganda, rather than a true and accurate picture of all matters and events described in the book.

3.      Since the book's publication and widespread dissemination based on such promotional efforts, some of Carter's closest aides, including distinguished public officials and scholars personally involved in the events described, have demonstrated with irrefutable evidence and credible detailed statements, the completely false nature of Carter's rendition of the historical record and certain key agreements and have established the book's fully deceptive nature and Carter's correspondingly deceptive agenda.

4.      Notwithstanding such irrefutable proof that many of the representations in the book unequivocally held out as true are in fact demonstrably false, misleading, and deceptive, Defendant SIMON & SCHUSTER, Inc. steadfastly has refused to make any corrections of such false, misleading, and deceptive provisions in the book and both Defendants continue unabashedly to promote the sale of this deceptive product as a work of non-fiction filled only with a truthful account all matters depicted in it, denying all claims by those well respected officials that Carter has fabricated things in the book which he claims to be true.

---

[1]   Reference herein to the "book" or "Book" refers to the hardcover, paperback, e-book, audio-tape versions and any other form or media in which the text appeared and was promoted and sold by Defendants or from which the Defendants have received any royalty or other payment.

5.      Plaintiffs wish to be clear about what this lawsuit is not about.  It is not in any way an attempt to challenge Defendant JIMMY CARTER's right to write a book, or Defendant SIMON & SCHUSTER's right to publish a book which serves as a forum for Carter to put forward his virulently ant-Israeli bias or any other agenda he or his financial backers wish to put forward.  Nor do Plaintiffs challenge his right to use falsehood, misrepresentations and omissions, misleading statements, or outright lies, all of which characterize this book, to further his agenda.  Indeed, Plaintiffs fully recognize that, such an agenda from Defendant JIMMY CARTER should come as no surprise, given his well known bias against Israel and the interests of Israel's sworn enemies who have given millions of dollars to support the Carter Center and Defendant JIMMY CARTER's work.

6.      Rather, Plaintiffs bring this action to challenge Defendants' actions in deceiving the public by promoting and selling this Book as a factually accurate account in all regards of the events its purports to depict, rather than truthfully and accurately promoting and selling it as the anti-Israel screed that it is, intentionally presenting untrue and inaccurate accounts of historically recorded events, as witnesses to and participants in such events pointedly have come forward to declare.  This lawsuit challenges the Defendants actions in attempting to capitalize on Carter's status as a former President of the United States to mislead unsuspecting members of the reading public who thought they could trust their former President to tell the truth.

7.      The Plaintiffs are members of the reading public who thought they could trust a former President of the United States and a well-established book publisher to tell the truth and who paid to get the truth from the Defendants, but were deceived when they learned that the Book is characterized instead by falsehoods, misrepresentations, misleading statements,

omissions of material facts, and outright lies designed to mislead and misstate the facts concerning the important subject it purports to address and the underlying historical record.

8.     This class action is brought pursuant to New York's consumer protection laws, specifically, New York General Business Law § 349, which makes it unlawful to engage in deceptive acts in the conduct of business, trade, or commerce or in furnishing any service in New York and which expressly provides for a private right of action to recover damages when one has been the victim of such deception.  It also is brought under New York common law causes of action applicable to the Defendants' conduct.  Finally, Plaintiffs ask the Court to enter a declaratory judgment, finding the Defendants' conduct, in writing, promoting, and encouraging the purchase and sale of the book at issue here by holding it out as a true account of the events described in the book, knowing that, in truth, it is filled with falsehoods, omissions, and misleading provisions, as described herein below to have violated NY CLS Gen Bus § 349 (a) (2010) and other provisions of New York law as specified below.

## THE PARTIES

9.     Plaintiff STEPHEN UNTERBERG is an adult dual citizen of the United States and Israel, residing in both New York and Israel, who purchased the book.

10.    Plaintiff SUSAN ECKMAN is an adult resident-citizen of Elizabeth, New Jersey who purchased the book.

11.    Plaintiff RYAN SHUMAN is an adult resident-citizen of Orono, Minnesota who purchased the book.

12.    Plaintiff DANICA BERNARD is an adult resident-citizen of Marina Del Rey, California who purchased the book.

13.     Plaintiff STEVEN TABAK is an adult dual citizen of the United States and Israel, residing in both New York and Israel, who purchased the book.

14.     Defendant, JIMMY CARTER was the 39th President of the United States, serving from 1977-1981.  Upon information and belief, he is an adult resident citizen of the State of Georgia.  As President, JIMMY CARTER presided over the signing of the Camp David Accords between Israel and Egypt.  Throughout his tenure in the White House and in the decades that have followed them, JIMMY CARTER has publicly involved himself in on-going political developments concerning the Middle East and portrays himself as a leading expert in the field of Middle East affairs and international diplomacy and especially in the area of Arab-Israeli relations. The defendant continued to travel widely throughout the Middle East to meet with regional leaders and to engage in discussions with political figures at the times relevant to this lawsuit.  He regularly lectures on the topic of and attends conferences involving Middle Eastern affairs and represents himself as a Middle East expert.

15.     Defendant SIMON & SCHUSTER, INC. was founded in 1924, and is one of the world's largest English language book publishers.  It is, upon information and belief, a New York Corporation with its principal place of business in New York, within the Southern District. According to its website, it is a part of the CBS Corporation.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2), in that the amount in controversy, exclusive of interest and costs, exceeds $5,000,000 and, upon information and belief, subsections (A) and (B) are satisfied and this action otherwise complies with the *Class Action Fairness Act of 2005*; and pursuant to 28 U.S.C.

§§2201; 2202.  This Court has supplemental jurisdiction over the state law claims under 28

U.S.C. §1367.  Venue is proper under 28 U.S.C. §1391.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure, on behalf of themselves and a class of plaintiffs defined as follows:

> All person or entities who purchased the book, *Palestine: Peace
> Not Apartheid*, as described more specifically herein, in hardcover,
> paperback, or electronic, audio, or any other media forum, any
> time from the date it was first published or anytime thereafter.
> Excluded from this class are the Defendant JIMMY CARTER and
> the Defendant SIMON & SCHUSTER, INC., its affiliates,
> employees, officers and directors, and other persons or entities
> which published the book   *Palestine: Peace Not Apartheid.*

18.     Plaintiffs reserve the right to amend this Class definition if discovery and further

investigation indicate that the Class should be expanded or otherwise modified.

19.     The requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil

Procedure are met in the following ways: While Plaintiffs currently are unable to determine the

exact number of members of the proposed Class, Plaintiffs estimate that the proposed Class

consists of not less than many thousands of members, such that joinder of all members is

impracticable.

20.     There are questions of law and fact common to the Class and such common

questions of law and fact predominate over any questions affecting only individual members.

Such common questions of law and fact include, but are not limited to the following:

a.     Whether Defendants made and published false and misleading facts in the book;

but marketed it as a work of non-fiction which purportedly is complete, true, and accurate with

respect to all facts set forth in it;

b.      Whether the Defendants acted intentionally, knowingly, recklessly, or with a reckless disregard of the truth in writing and publishing false and misleading statements in the book, which it presented as true and in omitting other material facts in order to further mislead the reader;

c.      Whether by their conduct, Defendants breached a contract with the members of the Class;

d.      Whether the Defendants' conduct as alleged herein constituted intentional and/or negligent misrepresentations as a matter of law;

e.      Whether Defendants have been unjustly enriched through their conduct and at the expense of the Class members;

f.      Whether the Defendants' conduct constituted a violation of the New York Consumer Protection Act, NY CLS Gen Bus §349 *et seq.*

21.      Plaintiffs' claims are typical of the claims of the Class.  All claims arise out of or are based on similar facts constituting the purchase of the book and the wrongful conduct of the Defendants as alleged herein.

22.      As Class representatives, Plaintiffs will fairly and adequately protect the interests of the class.  As noted, Plaintiffs claims are typical of the claims of all Class members.  Plaintiffs and all Class members were subjected to the same kind of harm; Plaintiffs' claims are not antagonistic to the claims of any Class member.  Plaintiffs will vigorously pursue all claims on behalf of all Class members and Plaintiffs' counsel are experienced litigators whose sole interest in this case is to professionally and zealously pursue the common claims among all Class members against these Defendants.

23.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy for, *inter alia*, the following reasons:

a.    It is economically impractical for members of the Class, who purchased the book for, on average, somewhere around $27.00 or less, to prosecute individual actions;

b.    The class is readily definable;

c.    Prosecution as a class action will eliminate repetitious individual actions and a waste of resources;

d.    A class action will enable all claims to be handled in an orderly, expeditious, and efficient manner and will lead to uniformity of decisions regarding the Defendants' conduct.

## FACTS

24.    Defendant JIMMY CARTER authored the book known as *"Palestine Peace Not Apartheid"* (hereinafter referred to as "the Book").

25.    Defendant SIMON & SCHUSTER, INC., upon information and belief, published both the hardcover and paperback editions, and all other media for the Book (e.g. audio version) and widely distributed the same, including, but not limited to throughout New York State.

26.    As a former American president and as a self-proclaimed Middle Eastern affairs expert, and, in some cases as a direct participant in the events at issue, the defendant JIMMY CARTER knew that substantial and material portions of the Book were untrue, and has failed to advise the public, or other defendants of that fact between on or about November 14, 2006 and through the present.

27.    Defendant SIMON & SCHUSTER, INC. knew, or should have known, that substantial and material portions of the Book were untrue, and has failed to advise the public or other defendants of this fact between on or about November 14, 2006.  Indeed, despite being

8

presented with statements from former Carter aides and colleagues, including experts on the subjects at issue and people directly involved with the events described in the book, which demonstrably proved the false or misleading nature of specified provisions in the book, SIMON & SCHUSTER, INC. refused to correct the same and, instead, reaffirmed its claim that the entire book was true as written.

## Defendant Jimmy Carter's Claims of Accuracy

28.     Defendant JIMMY CARTER has made numerous public appearances to promote the Book, at all times presenting the Book as a work of truth, purportedly reporting all events it describes as factually accurate and complete.

29.     Defendant JIMMY CARTER has given numerous interviews to the print and broadcast media to promote the Book, while portraying the Book as a work of truth.  He has repeated his contentions that the book was accurate in virtually every media appearance in which he has engaged.

30.     As an example, while appearing on the widely broadcasted "Larry King Live" program on CNN on December 8, 2006, defendant JIMMY CARTER declared: "Everything in the book, I might say, is completely accurate."

31.     The same day, December 8, 2006, the defendant JIMMY CARTER wrote in a piece published in the *Los Angeles Times* that: "I used maps, text and documents to describe the situation accurately and to analyze the only possible path to peace ...."

32.     In an interview with CNN's Soledad O'Brien on December 13, 2006, defendant JIMMY CARTER insisted: "I know what I'm talking about and the book is completely accurate."

33.     In an article published in the *Washington Post* on January 18, 2007, defendant

JIMMY CARTER is quoted as saying: "most critics have not seriously disputed or even mentioned the facts ...."

34.     Defendant JIMMY CARTER has repeatedly reiterated these statements in television, radio, and print, as well as in numerous speeches at bookstores, college campuses, symposia and other venues and has been at all times supported or endorsed by defendant SIMON & SCHUSTER, INC. in connection with the same.

**Pattern of Factual Inaccuracies**

35.     In reality, however, the Book is filled with factual inaccuracies and falsehoods. Defendant JIMMY CARTER was aware of, or should have been aware of, these material falsehoods when writing and promoting the Book. Defendant SIMON & SCHUSTER, INC. also was aware, should have been aware, and expressly was made aware of the material falsehoods as well.

36.     As an example, in the Book, defendant JIMMY CARTER continually misrepresents the contents of U.N. Security Resolution 242 enacted on November 22, 1967, by insinuating that according to international law Israel must completely withdraw from all territories acquired in the 1967 war.

37.     On page 38 of the Book, defendant JIMMY CARTER writes: "U.N. Resolution 242, which confirmed Israel's existence within its 1949 borders."

38.     On page 215 of the Book, defendant JIMMY CARTER writes: "[An option for Israel is] withdrawal to the 1967 border specified in U.N. Resolution 242 and as promised in the Camp David Accords and the Oslo Agreement ... ."

39.     Even a cursory reading of the U.N. document reveals that it does not provide what the defendant represents it does. U.N. Resolution 242 merely requires the State of Israel to

withdraw from "occupied territories" in the context of negotiations that will assure the Jewish State's "right to live in peace within secure and recognized boundaries free from threats or acts of force."

40.     Lord Caradon, the chief architect of Resolution 242, has expressly explained that Resolution 242 does not require withdrawal from all territories: "We could have said: well, you go back to the 1967 line … You couldn't have a worse line for a permanent international boundary.  It's where the troops happened to be on a certain night in 1948.  It's got no relation to the needs of the situation."   The clear historic intention of Resolution 242, as such, was never as defendant JIMMY CARTER represents in the Book to require Israel to "withdrawal to the 1967 border."  Carter, of course, omits this relevant historical record to further his anti-Israel agenda and to foster his deliberate efforts to mislead the reader.

41.     Defendant JIMMY CARTER injects other material falsehood in the Book in connection with its discussion of the status of Israel's eastern border with the Palestinian Territories, by referring to the borders as being established and internationally recognized.

42.     In fact, the international borders of Israel have never been finalized.  This was acknowledged in the Camp David Accords signed between Israel and Egypt on September 17, 1978, which defendant JIMMY CARTER both negotiated and signed.  The Camp David Accord provides that "the negotiations … will resolve among other matters, the location of the boundaries …."   Accordingly, the defendant JIMMY CARTER was party to a document drafted in 1978 that specifies that international borders between Israel and its neighbors must still be resolved in future negotiations,  and he clearly knew that the matter was not concluded in the 1967 U.N. Resolution 242 as he portrays in the Book.

43.     As the defendant JIMMY CARTER, who claims an expertise in Middle East

diplomacy, well knows, the lack of permanence regarding Israel's eastern boundaries has been a recurring theme in all international diplomacy and agreements in the region. Indeed, the 1994 Oslo Accords, which sets the framework for negotiations between Israel and the Palestinian Authority, recognized that borders "will be negotiated in the permanent status negotiations." Article XVII (1) (a). Accordingly, U.N. Resolution 242 does not stand for the premise concerning the establishment of Israel's borders that the defendant JIMMY CARTER represents in the Book.

44.    Neither Israel nor the United States, nor even the U.N. Security Council recognizes the 1949 armistice lines as international borders. Today, Israel only has internationally recognized borders with Egypt and Lebanon.

45.    Moreover, the 1949 armistice agreement between Israel and Jordan, which established the 1967 borders, clearly notes that the lines are not permanent: "The Armistice Demarcation Lines defined in articles V and VI of this Agreement are agreed upon by the Parties without prejudice to future territorial settlements or boundary lines or to claims of either Party relating thereto."

46.    However, on page 57 of the Book, defendant JIMMY CARTER writes: "The 1949 armistice demarcation lines became the borders of the new nation of Israel and were accepted by Israel and the United States, and recognized officially by the United Nations."

47.    The defendant JIMMY CARTER continues this blatant inaccuracy on page 207 of the Book, where he writes: "The unwavering official policy of the United State since Israel became a state has been that its borders must coincide with those prevailing from 1949-1967." Such falsehood is exacerbated by Carter's status as a former President who, in that role, spoke for the United States on matters of foreign policy and he attempts to capitalize on that status to

deceive his unsuspecting readers into believing his falsehoods as set forth in the book, rather than the true historical record of these events and the others on which he misleads or fabricates.

48.    In other passages in the Book, the defendant JIMMY CARTER, continues to misrepresent other international documents including the Camp David Accords, which he both negotiated and signed and again, in the promotion of the book, Defendants attempt to capitalize on his status in this regard in order to get the unsuspecting reader to believe what is written, knowing that in actuality it is false and misleading.

49.    As a further example, on pages 51-52 of the Book, defendant JIMMY CARTER writes: "[I]mportant provisions of [1978/1979] agreement have not been honored since I left office.  The Israelis have never granted any appreciable autonomy to the Palestinians."

50.    In 1993, following the signing of the Oslo Accords, the Palestinian Authority was created to control political, civic, security, medical, educational, and media institutions within the Palestinian Territories.  Since 1993 Israel has transferred control of 40% of the West Bank and 100% of Gaza to the Palestinian Authority.   Indeed, today approximately 98% of the Palestinian population lives under Palestinian self-rule.

51.    Defendant JIMMY CARTER, has continually misrepresented the Palestinian Authority's acceptance of the Road Map for Peace, and consistently and falsely has blamed Israel for the continued failure of its implementation.  Indeed, in every instance in which Carter, holding himself out as the former President and a Middle East expert, provides inaccurate information, it is always to the State of Israel's detriment.

52.    As a further example of his brazen pattern of fabrication, the defendant JIMMY CARTER negatively distorts Israel's behavior concerning an important recent diplomatic initiative. On page 173 of the Book, defendant JIMMY CARTER states:

Palestinian leaders had accepted all provisions of the Quartet's Roadmap for Peace, but that Sharon had publicly rejected most of its key provisions. There was no doubt that Abbas had the support and respect of his people and was dedicated to the immediate pursuit of a peace agreement in accordance with the Roadmap.

53.    In addition, on page 187 of the Book, defendant JIMMY CARTER writes: "[Abbas] has publicly endorsed the international community's Roadmap for Peace without equivocation and has been eager to negotiate with Israel since first becoming prime minister three years before being elected president."

54.    Similarly, on page 207 of the Book, defendant JIMMY CARTER writes: "Palestinian leaders unequivocally accepted this proposal, but Israel has officially rejected its key provisions with unacceptable caveats and prerequisites."

55.    Although, putative Palestinian Arab leader Mahmoud Abbas did verbally express his support for the Roadmap for Peace on several occasions, there is no evidence that the Palestinian Authority cabinet ever approved the Road Map or ratified it, as is required for an international agreement between two governmental entities. Furthermore there is no evidence that his cabinet ever even discussed the issue.

56.    In the Book, defendant JIMMY CARTER claims that it was Israeli leaders who insisted on caveats for implementation of the Road Map, but it was in reality Abbas who insisted on caveats and failed to implement the agreement. As but one example, Prime Minister Abbas insisted on a prisoner release, an item not expressly or otherwise implied in the agreement, as a necessary pre-condition before implementing any of the obligations he accepted to carry out. Furthermore, Abbas flatly refused to take forcible actions to disarm and dismantle terrorist organizations and infrastructure. Despite this the Israeli Cabinet endorsed the plan by a 12-7 vote on or about May 2003.

57.    In other instances in the Book's pattern of inaccuracies aimed at casting aspersions on the State of Israel, defendant JIMMY CARTER materially misrepresents U.N. Resolution 425 and the circumstances of the 2000 Israeli withdrawal from Lebanon.

58.    On page 71 of the Book, for instance, defendant JIMMY CARTER writes: "Israel has relinquished its control over ... almost all of Lebanon ...."

59.    Similarly, on Page 98 of the Book, defendant Jimmy Carter writes: "Israel retain[s] its presence only in Shebaa Farms."

60.    In truth, however, on June 16, 200 U.N. Secretary General Kofi Annan reported that: "Israeli forces have withdrawn from Lebanon in compliance with Resolution 425" and "in compliance with the line of withdrawal identified by the United Nations."

61.    Two days later the U.N. Security Council endorsed these settlements, confirming that Israel had withdrawn completely from recognized Lebanese territory. The defendant seems unable to accept the truth concerning the Israeli withdrawal and intentionally decided to blatantly misrepresent the facts.

62.    In addition, defendant JIMMY CARTER materially misrepresents the terms of U.N. Security Council Resolution 1701.

63.    On page 200 of the Book, defendant JIMMY CARTER writes: Security Council Resolution 1701 "provide[s] that combat would cease and that 15,000 Lebanese troops and an equal number from the international community would be deployed in Southern Lebanon as both Israeli and Hezbollah military forces withdrew. The key issues of prisoner exchange ... and the disarming of Hezbollah were postponed ...."

64.    In fact, a key paragraph of U.N.S.C. Resolution 1701 expressly calls for the complete disarmament of all armed groups in Lebanon so that "there will be no weapons or

authority in Lebanon other than that of the Lebanese State."

65.     The third paragraph of U.N.S.C. Resolution 1701 requires the "unconditional release of the abducted Israeli soldiers," while the fourth paragraph merely encourages "efforts aimed at urgently settling the issue of the Lebanese prisoners detained in Israel."

66.     In yet another example of the pattern, defendant JIMMY CARTER materially misrepresents the Camp David/Taba Negotiations and equally blames Israeli Prime Minister Ehud Barak and Palestinian President Yasir Arafat for the breakdown of negotiations, knowing that this was a false representation of the facts.

67.     On pages 150-151 of the Book, Defendant JIMMY CARTER writes: "There was no clear response from Prime Minister Barak, but he later stated that Israel had twenty pages of reservations."

68.     In the book *The Missing Peace*, Dennis Ross, the Chief U.S. negotiator at Camp David/Taba, clearly states that Prime Minister Barak accepted the Clinton peace plan. In an interview with CNN's Wolf Blitzer, referring to the Israeli government, Mr. Ross explains: "Their government, meaning the cabinet, actually voted it … this is a matter of record. This is not a matter of interpretation."

69.     Moreover, consistent with his pattern of inaccuracies, the defendant JIMMY CARTER materially misrepresents the terms of the Camp David/Taba Negotiations.

70.     On pages 150-151 of the Book, defendant JIMMY CARTER writes: "The best offer to the Palestinians – by Clinton, not Barak – had been to withdraw 20 percent of the settlers, leaving more than 180,000 in 209 settlements, covering about 10 percent of the occupied land, including land to be 'leased' and portions of the Jordan River valley and East Jerusalem."

71.     In reality, however, the proposed agreement called for Israeli withdrawal from

"between 94 and 96 percent of West Bank territory" with an accompanying land swap of 1 to 3 percent.

72.     Additionally the agreement called for a "small Israeli presence" under the authority of an international force that would remain in "fixed locations" of the Jordan River valley for a period no longer than 36 months.

73.     In one of the most egregious and shocking inaccuracies in the Book, defendant JIMMY CARTER goes so far as to materially misrepresent the map of the 2000 Clinton proposal.

74.     On page 148 of the Book, defendant JIMMY CARTER labeled one map "Palestinian Interpretation of Clinton's Proposal 2000" and another "Israeli Interpretation of Clinton's Proposal 2000."

75.     Chief U.S. negotiator Dennis Ross, who personally drew the original version of these maps, exposed Carter's complete fabrication in this regard and explained:

> [T]he "Palestinian interpretation" is actually taken from an Israeli map presented during the Camp David summit meeting in July 2000, while the "Israeli interpretation" is an approximation of what President Clinton subsequently proposed in December of that year. Without knowing this, the reader is left to conclude that the Clinton proposals must have been so ambiguous and unfair that Yassir Arafat … was justified in rejecting them.

76.     In addition, defendant JIMMY CARTER materially misrepresents another diplomatic attempt in the Arab-Israeli conflict, the Palestinian Prisoners' Proposal.

77.     On page 214 of the Book, defendant JIMMY CARTER writes: "The prisoners' proposal called for a unity government with Hamas joining the PLO, the release of all political prisoners, acceptance of Israel as a neighbor within its legal borders …."

78.     The defendant's characterization of the Prisoners' Proposal is considerably

inaccurate.   The plan contains no provisions whatsoever by the Palestinians declaring their acceptance of Israel as a neighbor.   This is simply a blatant misrepresentation on the part of the defendant, once again passed off as the truth.   Indeed, Carter's falsehood on this subject was revealed expressly by a Palestinian Arab official.   As Abdul Rahman Zidan, a Palestinian minister, told the BBC: "You will not find one word in the document clearly stating the recognition of Israel as a state."

79.    The defendant JIMMY CARTER's material misrepresentations are not merely limited to the Israeli-Palestinian conflict, he similarly distorts Israel's position vis-à-vis its peace negotiations with Syria. As an example, the Defendant misrepresents the Syrian position regarding a demilitarized Golan Heights under Syrian sovereignty as part of a peace deal between Israel and Syria.

80.    On page 130 of the Book, defendant JIMMY CARTER states: President Assad's "proposal was that both sides withdraw from the international border ... [and] Syria might move its troops farther from the border because of the terrain."

81.    Once again, it is a member of Carter's own inner circle who exposed this fabrication for exactly that.   Former Carter Center executive and close confidante, Emory University Professor Kenneth Stein, who attended the meeting between President Carter and President Assad explained in a *Los Angeles Times* article: "[Carter's] notes of the Damascus meeting show that Assad ... replied that Syria could not accept a demilitarized Golan without "sacrificing our sovereignty."   Stein also disputed Carter's statement "... that Assad expressed willingness to move Syria's troops father from the border than Israel should be required to do."   Apparently, Carter did not like the implications of the way the meeting actually unfolded and so he decided to re-write the conversation as to how he thought it should have gone.

82.    As another example, defendant JIMMY CARTER materially misrepresents the purpose and location of the Israeli security barrier erected to obstruct the ability of Palestinian suicide bombers to reach Israeli cities. .

83.    On page 189 of the book, defendant JIMMY CARTER writes: "Utilizing their political and military dominance, they are imposing a system of partial withdrawal, encapsulation, and apartheid on the Muslim and Christian citizens of the occupied territories. The driving purpose for the forced separation of the two peoples is ... the acquisition of land."

84.    In fact, the purpose of the security barrier was to prevent the incursions of Palestinian suicide terrorists into Israeli territory.  Since this temporary barrier was not placed along the path that Israeli government officials hope will be the future borders of the State, the defendant's statement is patently false.

85.    On page 190 of the Book, defendant JIMMY CARTER writes: "The governments of Ariel Sharon and Ehud Olmert have built the fence and wall entirely within Palestinian territory, intruding deeply into the West Bank to encompass Israeli settlement blocs and large areas of other Palestinian land."

86.    In reality U.N. maps confirms that the barrier adheres to the 1949 armistice lines along 45 percent of the 1949 lines.    In some places (near Tulkarem and Al Mughayyir Al Mutilla) the barrier actually extends into Israeli territory.

87.    On page 190 of the Book, defendant JIMMY CARTER writes: "[The barrier] is projected to be at least three and a half times as long as Israel's internationally recognized border ...."

88.    Even a report from the United Nations Office for the Coordination of Humanitarian Affairs, an office fundamentally hostile to Israel, undercuts Carter's claims.  It

provides as follows: "Because of its meandering path into the West Bank, the [total length of the route] is more than twice the length of the 'Green Line.'"

89.     Defendant JIMMY CARTER materially misrepresents the Arab position on Israel by minimizing and omitting Anti-Israel violence and Arab rejectionism.

90.     In addition, defendant JIMMY CARTER whitewashes both former Palestinian President Yassir Arafat and the terrorist organization Hamas and their utilization of violence against Israeli civilians.

91.     For example, on page 62 of the Book, defendant JIMMY CARTER writes: "When I met with Yassir Arafat in 1990, he stated, 'The PLO has never advocated the annihilation of Israel.  The Zionists started the 'drive the Jews into the sea' slogan and attributed it to the PLO.'"  The historical record, of course, developed by the Palestinian Arab leadership, puts the lie to Carter's claim.

92.     The 1968 PLO Charter describes Palestine as the area encompassing both Israel and the Palestinian Territories and states: "Armed struggle is the only way to liberate Palestine. This is the overall strategy, not merely a tactical phase."

93.     The PLO's founder and supreme leader of the Palestinian Arabs until his death, Yasser Arafat repeatedly made statements calling for the total destruction of Israel.  In an interview with Italian journalist Oriana Fallaci he stated: "The goal of our struggle is the end of Israel, and there can be no compromises or mediations … We don't want peace; we want victory. Peace for us means Israel's destruction and nothing else."  The notion that a former U.S. president and Middle East expert was not informed that the PLO sought Israel's destruction is an absurd premise. Indeed, during his White House tenure, Carter was forbidden from maintaining ties with the PLO specifically because its central goal was Israel's destruction.

94.     In this same vein, on page 179 of the Book, defendant JIMMY CARTER writes: "Hamas was now [January 2006] holding many local posts, and their incumbent officials had been free of any allegations of corruption and, for sixteen months, had meticulously observed a cease-fire commitment, which they called hudna."

95.     The following terrorist attacks were claimed by or attributed to Hamas during the period of the hudna:  (1) a rocket attack on Sep. 29, 2004 killed two preschool children, Yuval Abebeh, 4, and Dorit Benisian, 2, in Sderot; (2) a 24 year-old greenhouse worker, Pratheep Nanongham was killed by a rocket attack on Oct. 6, 2004; (3) 25 year-old Nissim Arbic was killed during a Hamas attack at the Erez Industrial Park; (4) six individuals were murdered in a Jan. 13, 2005 terrorist attack on the Karni crossing into Gaza, Hamas claimed joint responsibility; (5) Dana Galkowicz, 22, was killed by a Hamas rocket on July 14, 2005; and (6) on Sep. 21, 2005 Sasson Nuriel, 55, was kidnapped and murdered by Hamas.  A Middle East expert of the defendant's stature must have known that Hamas engaged in these terrorist attacks during the discussed period.

96.     On page 8 of the Book, defendant JIMMY CARTER writes: "1996: Palestinians elect Yasir Arafat as president and elect the members of a legislative council.  Israelis return the Likud Party to power, which stalls the Oslo process."

97.     Defendant JIMMY CARTER materially misrepresents the facts by omitting the events that occurred between President Arafat's election and the Likud victory in 1996.  The gravest omission is the dramatic increase of Palestinian terror attacks after Arafat's election which claimed the lives of 60 Israelis in February and March that directly influenced Likud's victory.  This was confirmed by a Reuters report on March 3, 1996: "After last Sunday's Hamas bombings killed 26 people, [Labor leader Shimon] Peres lost a commanding lead in opinion

polls."

98.    Defendant JIMMY CARTER materially misrepresents the facts of a shooting that occurred on January 21, 1996 by stating on page 168 of the Book: "Three Palestinians were shot and killed by Israeli police at a checkpoint in Jenin …."

99.    Almost all news reports of the incident indicate that it was Palestinians who initiated the attack by opening fire.  The *Boston Globe* reported that an Israeli soldier was wounded when the three Palestinian victims "tried to shoot their way past an Israeli roadblock."

100.    In addition, the defendant materially misrepresents Israeli settler land and water control in Gaza on page 168 of the Book by writing: "Living among 1.3 million Palestinians, the 8,000 Israeli settlers [in the Gaza Strip] were controlling 40 percent of the arable land and more than one-half the water resources … ."

101.    A June 2004 report on Gaza by the World Bank states that Israeli settlers control 15-20 percent of the land in Gaza.  Additionally settlers controlled little of the water in Gaza and Israel has transferred, and continues to transfer, large quantities of water to the Palestinians in Gaza.

102.    Defendant JIMMY CARTER materially misrepresents the water usage of Israeli settlers on page 121 of the Book by writing: "Each Israeli settler uses five times as much water as a Palestinian neighbor, who must pay four times as much per gallon."

103.    Again, even the Palestinian Arabs reveal the indisputably false nature of Carter's statements.  Sharif Elmusa, a former Palestinian water negotiator, stated that Palestinians pay "virtually identical … price" for water as Israelis do.  Furthermore while Israelis (both Jewish and Arab) use more water than Palestinians the ratio is actually two and a half times the amount used by Palestinians.

104.   Defendant JIMMY CARTER materially misrepresents Palestinian freedom of movement in regards to settlements on Page 151 of the Book by writing: "There is a zone with a radius of about four hundred meters around each settlement within which Palestinians cannot enter."

105.   In truth no such perimeter exists.   In fact many Palestinians enter settlements often for a variety of reasons chief among them employment opportunities.

106.   Defendant JIMMY CARTER materially misrepresents Hamas's position regarding the release of kidnapped soldier Gilad Shalit on Page 197 of the Book by writing: "They offered to exchange the soldier for the release of 95 women and 313 children who are among some 8,500 Palestinians in Israeli prisons.  Israel rejected any negotiations …."

107.   A report from CNN on June 26, 2006, stated: "Palestinian militants distributed a statement Monday saying they will provide *information* about a kidnapped Israeli soldier if Israel agrees to release all female prisoners and all children under 18 being held in Israeli jails" (Emphasis added).

108.   Defendant JIMMY CARTER materially misrepresents the cause and escalation of the 2006 Hezbollah War on page 201 of the Book by writing: "The conflict began when Hezbollah militants attacked two Israeli vehicles, killing three soldiers and capturing two others … Israel surprisingly declared that it had been assaulted by the entire nation of Lebanon, and launched an aerial bombardment … ."

109.   Defendant JIMMY CARTER omitted any mention of the fact that the original Hezbollah assault occurred within Israeli territory and in conjunction with the attack Hezbollah forces launched rockets at civilian targets within Israel.   Furthermore as a member of the Lebanese government, Hezbollah's activities can be credibly held as the actions of the Lebanese

government and nation.

110.    There are many other examples of falsehoods, misrepresentations of material facts, misleading statements and omissions, and outright lies throughout the Book in addition to the examples set forth above.  This Complaint does not purport to set out an all inclusive list.

### Plaintiffs' Injuries Are the Result of Defendants' Conduct

111.    Plaintiffs purchased and read the Book, on the representation that it was a factual and accurate presentation of the Israeli-Palestinian conflict.   In fact, however, numerous representations in the Book, including, but not limited to the examples provided above, are false, inaccurate, misleading and deceptive and were written, marketed, and promoted intentionally, wantonly, and willfully with the intent to deceive, with a reckless disregard for the truth and to mislead the reader.

112.    As such, the plaintiffs' injuries and harm are the direct and proximate result of defendants' conduct.

### CAUSES OF ACTION

### AS AND FOR A FIRST CLAIM FOR RELIEF
*BREACH OF CONTRACT*

113.    Plaintiffs reallege all prior allegations as though fully stated herein.

114.    Defendants have at all times represented the Book to be fully factual, accurate, and truthful.

115.    Plaintiffs and Class members purchased and/or read or listened to the Book based on the Defendants' representations that it was factual.

116.    Defendants' representations were false and its sales of the Book constitute a breach of contract.

117.    As a result of the breach Plaintiffs and Class members suffered damages which may fairly and reasonably be considered as arising naturally from the breach or may reasonably be supposed to have been in the contemplation of the parties, at the time they made the contract for the sale and purchase of the Book, as the probable result of the breach of it.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
*UNJUST ENRICHMENT*

118.    Plaintiffs reallege all prior allegations as though fully stated herein.

119.    Defendants were and continue to be unjustly enriched by their false representations as to the truthfulness of the Book in an amount to be proven at trial.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
*NEGLIGENT MISREPRESENTATION*

120.    Plaintiffs reallege all prior allegations as though fully stated herein.

121.    Defendants owed Plaintiffs and Class members a duty to exercise reasonable care in advertising the truthfulness of the Book.

122.    Defendants provided false information to Plaintiffs and Class members relating to the truthfulness of the Book.

123.    Defendants breached their duty to Plaintiffs and other Class members by failing to exercise reasonable care or competence in guaranteeing the truthfulness of the Book.

124.    Plaintiffs and Class members reasonably relied on the information provided by Defendants regarding the truthfulness of the Book.

125.    As a proximate cause of Defendants' false representations Plaintiffs and other Class members suffered damages in an amount to be proven at trial.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### *INTENTIONAL MISRERESENTATION (DECEIT)*

126.   Plaintiffs reallege all prior allegations as though fully stated herein.

127.   Defendants made representations of fact regarding the truthfulness of the Book for the purpose of inducing Plaintiffs and other Class members to purchase and/or read or listen to the Book.

128.   Defendants knew or should have known or believed the representations referred to in the preceding paragraph were false.

129.   Plaintiffs and other class members reasonably relied on Defendants' false representations.

130.   As a result of Defendants' false representations Plaintiffs and other Class members suffered damages in an amount to be proven at trial.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### *VIOLATION OF NEW YORK CONSUMER PROTECTION ACT*
### *NY CLS GEN BUS § 349 ET SEQ.*

131.   Plaintiffs reallege all prior allegations as though fully stated herein.

132.   At all times relevant to this action New York had in effect NY CLS Gen Bus § 349 (a) and (h) (2010) prohibiting unfair or deceptive acts or practices in the conduct of business, and granting  private right of action to vindicate one's rights under this Act.

133.   Defendants' false claims regarding the truthfulness of the Book constituted unfair or deceptive acts or practices in the conduct of trade or commerce.

134.   Defendants' acts or practices have the capacity to deceive and have deceived Plaintiffs, class members, and a substantial portion of the public and to affect the public interest.

135.    As a result of Defendants' unfair or deceptive acts or practices, Plaintiffs and other Class members suffered injuries in an amount to be proven at trial.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
*DECLARATORY JUDGMENT*

136.    Plaintiffs reallege all prior allegations as though fully stated herein.

137.    Plaintiffs and the Class, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct in misleading purchasers and readers of the Book violated the New York Consumer Protection Act and breached their implied or express contract with purchasers and readers of the book.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for judgment against the Defendants as follows:

(a)    For An order under Rule 23, F.R.C.P., certifying this case as a class action, designating Plaintiffs as class representatives, and designating undersigned counsel as class counsel;

(b)    For a Declaratory Judgment as requested in Paragraph 137 above;

(c)    For compensatory damages according to proof;

(d)    For punitive and exemplary damages according to proof;

(e)    For reasonable attorney's fees and costs of suit, according to proof; and

(f)    For such other and further relief as the court may deem just and proper:

**PLAINTIFFS DEMAND A JURY ON ALL ISSUES TRIABLE BY JURY**

Dated:   New York, New York
         February 1, 2011

                                   Respectfully submitted,


                          DAVID I. SCHOEN, ATTORNEY AT LAW
                          *Counsel for Plaintiffs*

                          By: _____
                               David I. Schoen (DS0860)


                          2800 Zelda Road, Suite 100-6
                          Montgomery, Alabama  36106
                          Telephone: (334) 395-6611
                          E-fax:      (917)  591-7586
                          Email:      dschoen593@aol.com


                          NITSANA DARSHAN-LEITNER & CO.
                          Nitsana Darshan-Leitner, Esq.
                          (*Israeli co-counsel for Plaintiffs*)
                          10 Hata'as Street
                          Ramat Gan, 52512 Israel
                          Email:  nitsanad@zahav.net.il